All right, our seventh case for this morning is Pavlicek against Commissioner Saul. And we have Mr. Duncan and Mr. Neltzer, looks like we, yes, we have everybody. So Mr. Duncan, you may proceed. Thank you, Your Honor. May it please the court. Good morning. Dana Duncan on behalf of Andrew Pavlicek. This case raises several interrelated issues for this court, but primarily to the weight of the treating physician statement. This being a pre-March 27th, 2017 case when the regulations were changed and the weight of the state agency psychological consultants' opinions. Pavlicek stands by the arguments made in his briefs filed herein. However, this argument is going to focus primarily on the heart of the entire case, which is the application of the regulatory factors, the weighing of those, and the articulation performed by the ALJ in the decision. If all other issues are removed or denied, the primary issue is going to be, as I'm outlining it, would still be grounds for remand. The Supreme Court has outlined and reiterated this point in the BSTIC decision. By employing the term substantial evidence, thus invoked among other things, the reviewing court's recognition that the early function of the process requires the grounds be clearly disclosed. In other words, substantial evidence is a issue of articulation. It's a standard of articulation. So let me ask you a question, Mr. Duncan. I mean, you know, there's a lot of detail, as usual, in these Social Security appeals. But it does seem that the ALJ's decision largely to give no credit to—I'm not sure he pronounces it—Dr. Oppenier's opinion is critical. Because the June 2017 report, if credited, would certainly show that Mr. Pavlicek was disabled. But the ALJ says, but this June 2017 report is so extreme and so far afield from anything else that Dr. Oppenier ever said that I'm not going to give it any weight, he says. And so he instead relies on the state reviewers and so on. That's the kind of thing under BSTEC that we would—that's kind of a call for the ALJ, isn't it? Even though there's some problems in the way the ALJ treated Dr. Oppenier's opinion. Yes, and I would agree normally. There are several problems, though, with the judge's assessment of the—and it's pronounced Opponier—Dr. Opponier's assessment. And I can outline those briefly. For example, Dr. Opponier found that he would have significant limitations in carrying out even simple—shorter simple instructions or responding appropriately to interactions with the public, dealing with changes in routine. They'd be off task 30% of the time. They'd have five absences per month. And while the ALJ can say that this is an extreme limitation, in looking at the record and if he would have actually compared the record in general with Dr. Opponier's ultimate findings, yes, he found good attention and concentration while he was in Dr. Opponier's office. That's a safe environment. The individual we're talking about here, during a routine traffic stop for his daughter for a seatbelt ticket, ended up having to be taken by ambulance to the emergency room and sedated. These kind of over or reactions are throughout the entire record. And clearly, they're noted in Dr. Opponier's records. The only way that a claimant could ever establish the type of criteria that the judge seems to be implying, which is, well, if the judge or if the doctor finds this, this, and this on that particular day, then their opinion ultimately should be discounted. The only way Dr. Opponier could have explored and documented this was if he spent time with Pavlicek outside of court or outside of the hearing office. We have ER records, we have consultative examinations that were done on a neuropsych eval that noted all of his problems. We have documented entries that show that his shaking was so bad it was disrupting furniture, simply because his doctor asked him to sign the treatment form. So I take it your principal argument, if I'm trying to understand this globally, is that he has these psychogenic problems. You know, it's pseudo seizures, it's psychogenic problems. They aren't fully amenable to treatment with the usual drugs that you might give people for different things. And also that if you look at Dr. Opponier from a long point of view as part of this medical practice staff, the ALJ was mistaken in criticizing the records going back to 2013. The ALJ is also mistaken in criticizing frequency of encounters. Is that the nub of it? More or less, yes, Your Honor. The thing is that what I'm pointing out is that the judge is making a call that this is extreme. But the record shows that there is a level of extremeness above this condition. This is not a typical person who has the occasional panic attacks or that has some anxiety issues or that medication generally controls. But Mr. Duncan, what in Dr. Opponier's report supports that that was the basis for his conclusions and opinions? Well... You're giving us an argument that I certainly didn't see supported by what Dr. Opponier has said. Well, the problem comes in that... And I'll point to... Where is my note? Excuse me. The court has previously ruled that the specific records that the... I'm drawing a blank as to the case name at the moment. But the Supreme Court has ruled that in a prior decision that the ALJ... Or excuse me, that the treating source does not have to have such detailed records that an ALJ can just disregard the treating source statement because there isn't enough evidence to back it up within the record. Because Dr. Opponier is a medical expert. But that's different than here where there's contradictory evidence. The basis of the ALJ's decision was, look, he's given these very extreme opinions. It said he relied on his treatment over the course of time. And those treatment notes that he's relying on contradict this extreme basis. I think your argument in the cases might support that if he hadn't given the necessary detail but had referred to what he had relied on. But that's not what's going on here. Except it is to a large extent, Your Honor. And this is why. Because even though he is saying that he has good attention and concentration while he's in the office and while he says that he's able to recall and have memory... We're not talking about that he is having these levels of panic attacks or pseudo seizures or anything on a consistent basis. There's enough in this record which indicates that he could not sustain competitive employment. Because case law, the vocational experts testimony at the hearing all said that if he just has a couple of days where he was absent per month because of these conditions, it would be more preclusive. There's just no... There's a strong correlation between the record as a whole and the opinion itself. And I'm not just saying this because the whole problem of carrying out simple instructions, dealing with changes in routine work settings, responding appropriately to interactions with the general public. The commissioner has said that those limitations, as described by Dr. Opanye, would tend to be work-preclusive. The SSR 85-15 and POMS ruling DI 25020.010A.3 indicate that a substantial loss of the ability to perform any of those three functions that Dr. Opanye describes in his decision would potentially erode the occupational base and a finding of disability merit. Okay, you're going to have to shut off Mr. Duncan. I'm sorry? You're about at the end of your time. All right, thank you. Thank you. Mr. Neltner. May it please the court, Andrew Neltner on behalf of the Commissioner of the Social Security Administration. Excuse me. The ALJ had multiple valid reasons for discounting Dr. Opanye's opinion. The commissioner is not arguing that the appellant did not appear at times to be shaking or did not have these psychogenic manifestations. The question is, how bad were they and are they so bad that this person cannot do any work? Dr. Opanye's opinion is indeed extreme. Can I ask you, Mr. Neltner, the opinion that we're talking about, the 2017 opinion, I'll call it, is very firm. It actually says that in the doctor's opinion, he meets the listing and all of that. Maybe that goes too far, but the ALJ brushed off everything else that Dr. Opanye said, including his statement that he thinks he met the listing as far back as 2013. The ALJ erroneously says, well, what does he know about 2013? Well, anybody in a group medical practice is going to look at the full medical file, whether it was one of your colleagues writing down a treatment note or whether it was yourself. That's the point of a group practice. So that seems to be a mistake by the ALJ. And the ALJ also thought that Mr. Pavlicek should be disregarded because he wasn't really seriously seeking enough treatment, that he was only going sporadically to see Dr. Opanye. But Dr. Opanye, again, was part of the team, and he's seeing Dr. Bienak. He's seeing other people. So doesn't that somewhat undermine the ALJ's just decision to throw the baby out with the bathwater, I mean, just to completely disregard everything Dr. Opanye said? I would argue that the ALJ did not completely disregard everything that Dr. Opanye said. The ALJ doesn't say that he's going to disregard the decision or give it no weight. So what we have here is the ALJ is looking at Dr. Opanye's opinion. I can understand the court's position that it would think it's reasonable to assume that Dr. Opanye would have looked at other records. But the commissioner will argue it is just as reasonable to assume he did not look at the other records. There is nothing in his notes that indicates he looked at the other records. Well, except that he refers back to 2013, which seems to be a sign that he's looking at the other records. What else could it mean? It could mean that he knows that the appellant has been treated since 2013. It doesn't mean he's looked at the records or digested what is in them. Again, the substantial evidence standard is whether or not it was reasonable. If there's evidence that supports the ALJ's decision, if it's reasonable for the ALJ to reach his conclusion, that's all it takes. The district court looked at this very issue, this exact issue of whether or not it was appropriate to conclude that Dr. Opanye had not looked at other records. The district court concluded it was entirely reasonable for the ALJ to reach that conclusion. This court may disagree, but if you have two reasonable minds reaching different conclusions, the decision gets affirmed. That is the heart of the substantial evidence standard. So we have Dr. Opanye's records, and we look at the records. But we wouldn't think it was reasonable if it was just a mistake of fact. You know, Dr. Opanye did look at the records, Dr. Opanye didn't. And if the records were clear that he couldn't have written this note without reference to the records, is he picking out particular dates out of the calendar? Do you think that was just random good luck? No, but I think he picks out only one date, and it's not even a year. No, actually there are three of them. His report refers to episodes that Pavlosek suffered on April 10, 2015, May 14, 2015, and July 29, 2015. And those are dates when he saw Dr. Binek, not himself. I apologize. I was mentioning the dates prior to when he had seen Dr. Opanye. I'm just saying that that's also in the record as a whole. And so it seems quite unlikely to me that he would have randomly chosen, say, 2013 as the start date or picked out these other dates without reading the records. And if the ALJ makes a finding that's just contrary to fact, we don't defer to that. Granted. So let's presume for a second that you're correct. And let's say that Dr. Opanye actually had those other records and looked at them. The question still stands, did substantial evidence support his extreme limitations? And it didn't. Every single time that the appellant went in to see Dr. Opanye, the mental examination done by Dr. Opanye, who is a psychiatrist, shows that his thought process was normal. Is a normal thought process enough to enable somebody to work if they have stress attacks and are sort of lying on the floor, half unconscious? I mean, you can have normal thought processes some of the time. But if you have these attacks, you're not functioning during that period. Absolutely. But the question is, how often does he have these attacks and how severe are they? And what does the record show when it comes to that? And every time he goes into the office, he seems to be fine. Now, opposing counsel mentioned a point where the appellant could not even sign something for a doctor's order. But that was at a doctor's office too, just like seeing Dr. Opanye at a doctor's office. This obviously is not manifesting all of the time. On top of that, you have the state agency doctors who reach different conclusions. Again, they don't say that there's not a problem here. They just don't find that it is as extreme as the appellant claims or as Dr. Opanye claimed. On top of the state agency doctors whose residual functional capacity assessment the ALJ largely adopted, you have numerous notations in the record that call into question the severity and consistency of the appellant's presentation. You have the fact that the appellant's function reports conflict with what his own wife says. Appellant says he did not go places regularly, but when his wife completes the function report, she says he left home daily and would go shopping. He says he has a short attention span. His wife fills out the form, and it says that he can maintain attention well. He says he can't handle changes, but when the wife fills out the form, it says he can handle changes. On top of this, you have very questionable presentations in terms of one doctor wondering, if his tremors are as bad as he said, how come he's never had a fall? You have an instance where he appears unresponsive. However, when the doctors mention that he might have to get a catheter for a urine specimen, he apparently wakes up and asks if he can just pee in a cup instead. You have instances where one doctor noted, this is at records page 660, that he had inconsistent effort with directed motor tasks. So it's the ALJ's job to weigh all of this evidence. And clearly, it's not a slam dunk either way, but that's a substantial evidence standard. That's the ALJ's job. And when the ALJ has two state agency psychologists who find restrictions that allow for work, has a questionable record where the appellant is sometimes presenting with problems, sometimes not, and sometimes presenting very questionably with those problems, the commissioner submits that substantial evidence supports the ALJ's decision in the mental residual functional capacity. Excuse me. I would assume that he's no longer capable of being a truck driver, but is there any discussion about the kind of work he could do with his present condition? There is in terms of the step five analysis. So the ALJ did find, you are correct, that he can no longer drive given his restrictions. But there were a number of other jobs that he could do, including an assembler of metal furniture, a hand packager, and a scrap sorter. So there is work out there that this person can do, and that's the heart of the disability decision. Can this person work? The ALJ looks at the evidence, weighs it, reaches a conclusion. It doesn't have to be perfect, but the evidence here is strong to discredit Dr. Apane's opinion when balanced against two state agency doctors and a very questionable record. If there are no further questions, the commissioner rests. All right. Thank you very much. You are almost out of time, Mr. Duncan, but I'll give you a minute if you need to rebut. You need to take yourself off mute. There we go. All right. Sorry. I would like to point out one thing, which is even if 28 days out of the month the claimant is perfectly fine, two days out of the month he has a problem with this, it would be work preclusive by the vocational expert's testimony. So the fact is, too, case law and other things say that unscheduled breaks, even one, if not two a week, would be more preclusive. So if he has these problems as a result of having to be to work every day, to be productive, he's going to have problems, and it's going to manifest and preclude work. The second side of this is one that I would point out. The ALJ only summarized the findings of the state agency doctors, stated the weight they were given, and tied their findings to his residual functional capacity. There's nothing about what evidence they reviewed. There's not anything about the evidence that occurred after their assessment in March and July of 2015, or anything about what they found or why that specific finding should be given weight, and that's a requirement. They're not exempt from having the same requirements of the treating sources. Okay. I think we'll have to leave it there, but thank you very much. Thanks to both counsel. We'll take the case under advisement.